**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
IN THE MATTER OF DEFEND H20, KEVIN
MCALLISTER, MICHAEL BOTTINI, RAV
FREIDEL, JAY LEVINE, THOMAS MUSE,          **ORDER**
PAUL LESTER, NAT MILLER, DANIEL           15-cv-2349 (ADS)(AYS)
LESTER, and CONRAD COSTANZO,
                            Plaintiffs,


                -against-


TOWN BOARD OF THE TOWN OF EAST
HAMPTON, the COUNTY OF SUFFOLK,
DEPARTMENT OF ENVIRONMENTAL
CONSERVATION OF THE STATE OF
NEW YORK, and the U.S. ARMY CORPS
OF ENGINEERS,
                            Defendants,


ROYAL ATLANTIC CORPORATION,
ROYAL ATLANTIC EAST CONDOMINIUM
OWNERS ASSOCIATION, INC.,
and MONTAUK BEACH PRESERVATION
ASSOCIATION, INC.,

                Intervenor Defandants
-----------------------------------------------------------X

-----------------------------------------------------------X

Defend H20, CONRAD COSTANZO, DANIEL       **ORDER**
LESTER, PAUL LESTER, and NAT MILLER,      15-CV-5735 (ADS)(AYS)
                            Plaintiffs,


                -against-


UNITED STATES ARMY CORPS OF
ENGINEERS, TOWN BOARD OF THE TOWN
OF EAST HAMPTON, DEPARTMENT OF
ENVIRONMENTAL CONSERVATION OF
THE STATE OF NEW YORK, COL. DAVID
CALDWELL, in his official capacity as
Commander of the New York District of the
United States Army Corps of Engineers,

ACTING COMMISIONER MARC
GERSTMAN, in his official capacity as Acting
Commissioner of the Department of
Environmental Conservation of the State of New
York, and the COUNTY OF SUFFOLK,
                              Defendants.

------------------------------------------------------------X


**APPEARANCES:**

**The Law Offices of Carl Andrew Irace & Associates, PLLC**
*Attorneys for the Plaintiffs*
12 Gay Road #5128
East Hampton, NY 11937

**Devitt Spellman Barrett, LLP**
*Attorneys for the Town Board of the Town of East Hampton*
50 Route 111, Suite 314
Smithtown, NY 11787
            By: David H. Arntsen, Esq.
                John Denby, Esq.
                Anne C. Leahey, Esq., Of Counsel

**Suffolk County Dept. of Law**
100 Verterans Memorial Highway
Hauppauge, NY 11788
            By:  Gail M. Lolis, Assistant County Attorney
                Leonard G. Kapsalis, Assistant County Attorney

**Office of the New York Attorney General**
120 Broadway
New York, NY 10271
            By: Kevin G.W. Olson, Assistant Attorney General

**U.S. Attorney's Office, Eastern District of New York**
271 Cadman Plaza East
Brooklyn, NY 11201
            By: Edwin R. Cortes, Assistant U.S. Attorney
                Robert B. Kambic, Assistant U.S. Attorney

**SPATT, District Judge**.

This is a consolidated proceeding involving two actions arising from the decision by the Defendant United States Army Corps of Engineers (the "Corps") to build a reinforced sand dune on the beach in Montauk, New York with the stated purpose of "addressing the immediate need to reduce risk to life and property that resulted from Hurricane Sandy" (the "Project"). The Project was scheduled to commence on October 1, 2015 and to conclude in February 2016.

In the first action bearing docket number, 15-cv-2349 (the "Removal Action"), the Plaintiffs Defend H20, Kevin McAllister ("McAllister"), Michael Bottini ("Bottini"), Rav Freidel ("Friedel"), Jay Levine ("Levine"), Thomas Muse ("Muse"), Conrad Costanzo ("Costanzo"), Daniel Lester, Paul Lester, and Nat Miller ("Miller") (collectively, the "Plaintiffs") seek to nullify the decision to approve the Project under Articles 30 and 78 of the New York Civil Practice Law and Rules ("CPLR").

In the second action bearing docket number, 15-cv-5735 (the "Federal Action"), the Plaintiffs also seek to nullify the decision to approve the Project under the Federal Administrative Procedure Action, 5 U.S.C. §§ 701–06 (the "APA").

On October 1, 2015, the day that construction on the Project was scheduled to commence, the Plaintiffs filed a motion for a temporary restraining order ("TRO") pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 65 to halt construction on the Project until February 15, 2016. By order to show cause, the Plaintiffs also filed a request for a preliminary injunction, also pursuant to Fed. R. Civ. P. 65, seeking essentially the same relief as the TRO.

On October 1, 2015, the Court held a hearing during which it denied the Plaintiffs' request for a TRO and requested further briefing as to whether a preliminary injunction should issue.

On October 2, 2015, the Court referred the matter to United States Magistrate Judge Anne Y. Shields to hold a hearing, if necessary, and for a recommendation as to whether the Court should grant the Plaintiffs' motion for a preliminary injunction.

On October 15, 2015, Judge Shields issued a report and recommendation ("R&R") finding that an evidentiary hearing was not necessary and recommending that the Court deny the Plaintiffs' motion for a preliminary injunction.

Presently before the Court are the Plaintiffs' objections to the R&R.

The Court notes that it has received a number of calls and letters from purported residents of Montauk expressing their opposition to the Project. While the Project has given rise to strong sentiment among some members of the Montauk community, the Court must decide the Plaintiffs' present motion for a preliminary injunction according to the evidence presented by the represented parties in this action. Based on that evidence, the Court finds that the Plaintiffs are not entitled to a preliminary injunction. Therefore, for the reasons set forth below, the Court overrules the Plaintiffs' objections and adopts the well-reasoned R&R issued by Judge Shields in its entirety.

## I. BACKGROUND

Familiarity with the R&R is presumed. However, the Court finds it necessary to provide a brief overview of the statutory and regulatory framework governing federal activity in coastal zones, such as Montauk, as well as the process followed by the Corps prior to starting construction on the Project.

## A. The Project

The "unincorporated hamlet of Montauk . . . is a major tourist destination with many hotels, restaurants and shops in the downtown area." (Cortes Decl., 15-cv-2349 Dkt. No. 58–2,

at 5.).  Historically, the "downtown area of the hamlet of Montauk is vulnerable to nor'easters

and hurricanes which produce storm surges and waves that historically have caused erosion to

the beach and dunes in the . . . [a]rea."  (Id. at 10.)

To address this problem, on July 14, 1960, as part of Section 101 of the Rivers and

Harbors Act, P.L. 86–645, Congress authorized, the Corps to undertake certain coastal storm risk

management projects, including the "Fire Island Inlet to Montauk Point, New York, Combined

Beach Erosion Control and Hurricane Protection Project" ("FIMP Project").  (Vargas Decl., 15-

cv-2349 Dkt. No. 58–8, at ¶ 3.)

In 1978, the Corps reformulated the FIMP Project (the "FIMP Reformulation Project"),

which included a plan to conduct a Reformulation Study (the "FIMP Reformulation Study") to

"select the optimum approach to long-term (50-year) storm damage reduction" in the FIMP area.

(Id. at ¶ 5; see also Cortes Decl., Dkt. No. 25–3, Ex. 3.)  However, the Corps has yet to complete

the FIMP Reformulation Project "primarily due to local sponsors' reluctance to commit to

payment of their required share of project costs."  (Id. at ¶ 5.)

On October 29, 2012, Hurricane Sandy hit New York, causing "severe coastal erosion in

the shoreline of downtown Montauk" and damage to commercial buildings in downtown

Montauk.  (Id. at ¶ 6.)  On January 29, 2013, in order to address the damage caused by Hurricane

Sandy, Congress passed the Disaster Relief Appropriations Act, P.L. 113-2, which provided one

hundred percent federal funding to the FIMP Reformulation Project.  (Vargas Decl., 15-cv-2349

Dkt. No. 58–8, at ¶ 7.)

Subsequently, the Corps determined that in addition to the long-term FIMP

Reformulation Study, short-term measures were necessary to address the immediate threat posed

by future hurricanes to the coastline area from the Fire Island Inlet to Montauk Point. (See Cortes Decl., 15-cv-2349 Dkt. No. 58–2, at i.)

One of the short-term projects proposed by the Corps was the construction of a 3,100 foot "reinforced dune," which was to extend "from South Emery Street to Atlantic Terrace motel in downtown Montauk and tapering into existing high dunes at both ends of the project area." (Id. at ii.)

The Corps planned to construct the dune using "14,175 Geotextile Sand Containers ("GSCs") with filled dimensions of about 5.5 ft long, 3.5 ft wide, and 1.5 ft tall, each weighing 1.7 tons." (Id.) Once filled, the GSCs would be covered by an additional three feet of sand to "provide protection to the toe of the structure and decrease the likelihood of exposure of the GSCs during small storm events." (Id.) The Corps estimated that the Project would provide immediate protection to the Downtown Montauk area for a period of twenty-five years and that the structure itself would have a "project life" of fifteen years. (See id. at 30.)

The Court will now discuss the various statutory and regulatory approvals that the Corps was required to comply with according to federal and state law prior to commencing construction on the Project.

**B. The Statutory and Regulatory Framework**

**1. The Coastal Zone Management Act**

In 1972, Congress passed the Coastal Zone Management Act, 16 U.S.C. § 1452 ("CZMA"), to "encourage and assist the states to . . . develop[] and implement[] . . . management programs to achieve wise use of the land and water resources of the coastal zone."

To achieve this goal, Congress developed "a system of grants and other incentives" to encourage states to develop coastal management programs ("CMP's"). Sec'y of the Interior v.

6

California, 464 U.S. 312, 316, 104 S. Ct. 656, 659, 78 L. Ed. 2d 496 (1984); see also 16 U.S.C. §§ 1454, 55.  Under the CZMA, a CMP can include "a comprehensive statement in words, maps, illustrations, or other media of communication, prepared and adopted by the state in accordance with the provisions of this chapter, setting forth objectives, policies, and standards to guide public and private uses of lands and waters in the coastal zone." 16 U.S.C.A. § 1453.

Relevant here, once the Secretary of Commerce approves a state's CMP, the CZMA requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone . . . . be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs."  16 U.S.C. § 1456(c)(1)(A).

An agency ensures the consistency of its proposed actions with state approved CMPs by submitting a "consistency determination to the relevant State agency . . . no  . . . later that 90 days before final approval of the Federal activity, unless both the Federal Agency and the State agency agree to a different schedule." 16 U.S.C.A. § 1456(c)(1)(C).

Federal regulation, in turn, defines the term, "consistent to the maximum extent practicable," as "fully consistent with the enforceable policies of management programs unless full consistency is prohibited by existing law applicable to the Federal agency." 15 C.F.R. § 930.32.  In that regard:

> If a Federal agency asserts that full consistency with the management program is prohibited, it shall clearly describe, in writing, to the State agency the statutory provisions, legislative history, or other legal authority which limits the Federal agency's discretion to be fully consistent with the enforceable policies of the management program.

Id. at § 930.32(a)(2).

In addition, a federal agency "may deviate from full consistency with an approved management program when such deviation is justified because of an emergency or other similar unforeseen circumstance ('exigent circumstance'), which presents the Federal agency with a substantial obstacle that prevents complete adherence to the approved program." Id. § 930.32(b).

However, "[o]nce the exigent circumstances have passed, and if the Federal agency is still carrying out an activity with coastal effects, Federal agencies shall . . . ensure that the activity is consistent to the maximum extent practicable with the enforceable policies of management programs." Id.

Once a federal agency has issued its consistency determination, the relevant state agency may concur or object to it. Id. at § 930.41(a).

If the state objects to the federal agency's consistency determination, the federal agency can still proceed with the challenged activity so long as "the Federal agency has concluded that its proposed action is fully consistent with the enforceable policies of the management program" and notifies the state agency in writing before it commences with the project. Id. at § 930.43

**2. The New York State Coastal and Waterways Act**

In 1981, the New York State Legislature enacted the Waterfront Revitalization of Coastal Areas and Inland Waterways Act, N.Y. Exec. Law § 910, *et seq.* (the "NYS Coastal and Waterways Act"), which authorized the New York Department of State ("DOS") to establish a CMP pursuant to the CZMA. See also Entergy Nuclear Indian Point 2, LLC v. New York State Dep't of State, 41 Misc. 3d 1237(A), 983 N.Y.S.2d 202 (Sup. Ct. Albany County 2013).

On August 13, 1982, the DOS submitted a proposed CMP to the U.S. Department of Commerce for approval. See New York State Coastal Management Program and Final Environmental Impact ("NY CMP"), *available at http://www.dos.ny.gov/opd/programs*; see also

Entergy Nuclear Indian Point 2, LLC v. New York State Dep't of State, 41 Misc. 3d 1237(A), 983 N.Y.S.2d 202 (Sup. Ct. 2013). On September 30, 1982, the U.S. Department of Commerce approved the New York CMP. (See Am. Compl., 15-cv-2349, at ¶ 148.)

The New York CMP contains a list of forty-four policy statements intended to "promote[] the beneficial use of coastal resources, prevent[] their impairment, [and] deal[] with major activities that substantially affect numerous resources."

In addition, the NYS Coastal and Waterways Act also encourages local governments to participate in the State's coastal management efforts by submitting local waterfront revitalization programs ("LWRPs") to the Secretary of the DOS for approval. See N.Y. Exec. Law § 915(1). If an LWRP is approved by the Secretary of the DOS, state agency actions must also "be consistent to the maximum extent practicable with the local program." Id. at § 915(8). In addition, the U.S. Department of Commerce may approve an LWRP "as a refinement of and means to further implement the CMP at the local government level." N.Y. Comp. Codes R. & Regs. tit. 19, § 600.2. Thus, once an LWRP is approved at the federal and state level, all federal and state actions must "be consistent to the maximum extent practicable with the local program." See id.

On December 3, 1999, the Town of East Hampton approved an LWRP covering a coastal area in the Town, which includes an area "along Town's Peconic Estuary shore to Montauk Point." See Town of East Hampton Local Waterfront Revitalization Program ("East Hampton LWRP"), at v-9, available at http://docs.dos.ny.gov/communitieswaterfronts/LWRP. On December 20, 2008, the DOS approved the East Hampton LWRP, and on August 25, 2008, the U.S. Office of Ocean and Coastal Resources Management also approved the program. See id.

Thus, it is undisputed that any federal activity in the coastal area along the Montauk shore is required under the CZMA to be undertaken "in a manner which is consistent to the maximum extent practicable" with the East Hampton LWRP.  16 U.S.C. § 1456(c)(1)(A).

**3. The National Environmental Policy Act**

In 1970, Congress enacted the National Environmental Policy Act, 42 U.S.C. § 4321 ("NEPA") to "promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man[.]"  42 U.S.C.A. § 4321.  To achieve this goal, NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for any major federal action "significantly affecting the quality of the human environment."  42 U.S.C. § 4332(C).  The EIS must address:

> (i) the environmental impact of the proposed action, (ii) any adverse environmental effect which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local and short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Id.

In addition, the NEPA created the Council on Environmental Quality ("CEQ") to promulgate regulations that supplement the statutory requirements of NEPA. See id. at § 4344; see also Nat'l Audubon Soc. v. Hoffman, 132 F.3d 7, 12 (2d Cir. 1997) ("The Council on Environmental Quality (CEQ), created under NEPA, is responsible for promulgating regulations that supplement NEPA's statutory requirements.").  The CEQ regulations provide that if an agency is uncertain as to whether the environmental impact of a proposed action rises to the level of "a major federal action" requiring an EIS, the agency must prepare an Environmental Assessment ("EA").  See 40 C.F.R. §§ 1501.3, 1501.4, 1508.9; see also Hoffman, 132 F.3d at 12.

An EA is a shorter and more concise document than an EIS.  The CEQ regulations define an EA as a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  40 C.F.R. § 1508.9.

If an agency determines that an EIS is not required, it must also issue a "finding of no impact" statement ("FONSI"), which "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared."  See id. at §§ 1501.4(e), 1508.13.

## C. The Approval Process For the Project

### 1. Consistency Determination

On August 11, 2014, Peter Weppler ("Weppler"), Chief of the Environmental Section of the Corps, sent a letter to Jeffrey Zappieri ("Zappieri"), an official at the DOS, stating that the Corps had determined that construction of the Project was consistent with the East Hampton LWRP and the New York CMP.  Weppler attached to the letter two separate documents which set forth what the Corps determined were the applicable policies in the LWRP and the New York CMP, and explained how the Project met or advanced those policies.  (Cortes Decl., 15-cv-2349, Dkt. No. 25-3.)

### 2. The Draft EA and FONSI Statement

On August 26, 2014, the Corps released a draft EA and FONSI statement and made them available for public comment for a period of thirty days.  (Cortes Reply Decl., 15-cv-2349, Dkt. No. 41, at ¶¶ 3–4.)  The Draft EA noted that prior to Hurricane Sandy, the Corps, as part of the FIMP Reformulation Study, undertook an initial screening of projects intended to address erosion along Montauk Beach.  (See id., Ex. 2, at 6–8.)  In particular, the Corps considered "non-

structural measures, beachfill with structures, and beachfill" and analyzed each measure based on "general design requirements, costs, and local acceptability." (Id. at 8.)  At that time, the Corps recommended a "small scale beach nourishment project, or feeder beach."  (Id.)

However, after Hurricane Sandy, the Corps revisited its plan to "determine if the eroded beach condition and updated costs and benefits warranted selection of a larger alternative plan." (Id.)  In so doing, the Corps considered five alternatives:  (i) "Beach Restoration"; (ii) "Beach Restoration and Buried Seawall"; (iii) "Feeder Beach"; (iv) "Dune Reinforcement"; and (v) Dune Reinforcement and Feeder Beach."  (Id.)

In addition to studying the long-term benefits of these five alternatives, the Corps also considered whether any of these plans could address the short-term need to repair damage caused by Hurricane Sandy.  (Id.)  The Corps concluded that Dune Reinforcement, Alternative 4, was the only viable option for a short-term project because:

> Due to the large quantities of sand fill required for construction of Alternatives 1, 2, 3, and 5 dredging of an offshore borrow area would be required. Dune Reinforcement (Alternative 4) requires significantly less sand, approximately 51,000 cy, than other four alternatives. Therefore, it is feasible and expected to be less costly to obtain the necessary sand fill material from upland sediment sources . . . . Alternatives 1, 2, 3, and 5 all have very high costs, and can only perform as designed if done in conjunction with a long-term plan for renourishment.

(Id. at 8–9.)

In addition to the five alternatives discussed above, the Corps also considered a "No Action Alternative," under which the Corps and the Federal Government "would take no action to reduce storm damages in the study area," and instead rely on local governments and non-governmental groups to "take actions to protect themselves by undertaking their own construction projects to build up the beach and dune profiles."  (Id. at 9.)  The Corps found this

alternative **to** be insufficient because the "extent and details of the actions" that local actors might take to address potential storm damages were not known.  (See id. at 9–10.)

On August 26, 2014, the Corps also released a draft FONSI statement on its website for public comment which concluded that the Project did not constitute "a major federal action significantly affecting the quality of the human environment" and therefore, did not require the preparation of a detailed EIS under NEPA § 102(2)(C).  (Cortes Decl., 15-cv-2349, Dkt. No. 41-5, at 3.)

### 3. The Public Comments and the Final EA and FONSI Statements

During the thirty-day public comment period, the Corps received comments on its draft EA and FONSI statement from: (i) the Historic Preservation Technician; (ii) Yogi Harper, President of Erosion Control Specialists of North Carolina, Inc.; (iii) several former environmental planners and longtime residents of East Hampton; (iv) the Concerned Citizens of Montauk; and (v) the United States Environmental Protection Agency ("EPA").  (Cortes Decl., 15-cv-2349, Dkt. No. 41–5.)  Notably, it is undisputed that the Plaintiffs did not submit written comments.

In October 2014, the Corps finalized the EA, and on November 12, 2014, it finalized the FONSI statement.  (Cortes Decl., 15-cv-2349, Dkt. No. 41, at ¶¶ 4–5.)  On December 8, 2014, the Corps released both documents on its website.  See Downtown Montauk Stabilization Project, Final Environmental Assessment, *available at http://www.nan.usace.army.mil.*

In the finalized drafts, the Corps made revisions to the EA and FONSI statement based on some of the comments it received on the drafts.  (See id.)  For example, in a September 24, 2014 letter, Grace Musumeci ("Musumeci"), Chief of the Environmental Review Section of the EPA, asked the Corps to provide more detail explaining (i) the reasons that it selected the reinforced

dune option over the no action alternative; and (ii) "the expected fate of the geotextile bags at the

end of the project life, or in the event that they prematurely become unearthed as a result of

another superstorm."  (Cortes Decl., 15-cv-2349, Dkt. No. 41–5.)

In response, the final draft EA explains in more detail why the "No Action Alternative"

was not a viable option:

> The minimum beach and dune condition that is currently maintained merely helps
> to provide continued access to the beach; it provides only limited protection
> against severe storms. A more robust dune and beach is required to provide
> adequate protection from severe storms and address the vulnerability of the
> project area.

(Cortes Decl., 15-cv-2349, Dkt. No. 41–6, at 8.)

In addition, the Corps added a more thorough discussion of what might result if

the GSCs deteriorate and the steps the Corps plans to take to "avoid and/or minimize

some of the project's impacts to fish and wildlife resources," including:

- The GSCs will be buried with sand to provide suitable dune habitat.
- The grain size of the sand used to bury the GSCs is the same or slightly larger than the native sediment.
- The project is designed to maximize the stability of the GSCs and reduce the potential for undermining and exposure of the GSC which would diminish habitat suitability for affected species.
- 45,000 cy of sand will be obtained from upland sediment sources and will avoid off-shore borrow area ocean bottom disturbances.

(Id. at 46.)

### 4. The Concurrence of the DOS and the Town

In an October 24, 2014 letter to Weppler, Matthew Millea ("Millea"), the New York

Deputy Secretary of State, indicated that the DOS concurred with the Corps' determination that

the Project is consistent with the New York CMP and the East Hampton LWRP. (Am. Compl.,

Dkt. No. 5, Ex. 2.)

On November 3, 2014, Brian Frank ("Frank"), Chief Environmental Analyst for the Town of East Hampton ("East Hampton"), sent a letter to Weppler indicating that the Town also concluded that the Project does not conflict with the East Hampton LWRP.  (Id. at Ex. 6)

## D. The Project

In March 2015, the Corps entered into an agreement with H&L Contracting LLC ("H&L Contracting") to construct the Project.  (Verga Decl., 15-cv-2349, Dkt. No. 58–8, at ¶ 11.)  Under the agreement, H&L Contracting received a total of $8.4 million, of which $600,000 was devoted to costs related to "mobilization" and "de-mobilization."  (Id. at ¶ 11; Meranda Decl.,15-cv-2349, Dkt. No. 58–9, at ¶ 7.)

According to the Corps, "[m]obilization is the process by which H&L would set up their equipment, machinery, office trailers and everything else needed to commence construction." (Meranda Decl.,15-cv-2349, Dkt. No. 58–9, at ¶ 5.)  De-mobilization is "the process by which H&L would remove all of their equipment."  (Id. at ¶ 7.)

In order to minimize disruption to the beach season, the Corps and H&L planned to commence mobilization for the project on October 1, 2015 and to begin construction on October 13, 2015.  (Verga Decl., 15-cv-2349, Dkt. No. 58–8, at ¶ 12.)  The Project was scheduled to be completed by the end of February 2016 before the start of the 2016 beach season.  (Id.)

## E.  The Procedural History

### 1. The Removed Action

On March 19, 2015, the Plaintiffs Defend H20, McAllister, Bottini, Freidel, Levine, and Muse (collectively, the "Original Plaintiffs") commenced the Removal Action in the Supreme Court of the State of New York, Suffolk County seeking a judgment pursuant to Articles 30 and 78 of the CPLR nullifying the decision to approve the Project by the Respondents East Hampton,

the County of Suffolk (the "County"), the New York State Department of Environmental Conservation ("DEC"), and the Corps (collectively, the "Removed Defendants").

On April 24, 2015, the Corps removed this action to federal court pursuant to 28 U.S.C. § 1442(a)(1).

On April 29, 2015, the Plaintiff filed an amended complaint in the Removed Action, which added Costanzo, Daniel Lester, Paul Lester, and Miller (together with the "Original Plaintiffs," the "Plaintiffs").

The amended complaint describes the Plaintiff Defend H20 as a non-profit organization whose membership consists of individuals who "live, work, or recreate near or at the [P]roject site." (Am. Compl., 15-cv-2349, Dkt. No. 5, at ¶ 12.) The eight individual Plaintiffs are members of H20 who live in the Montauk area. (Id. at ¶¶ 52–126.)

On May 23, 2015, the Court so-ordered a stipulation permitting Royal Atlantic Corporation, Royal Atlantic East Condominium Owners Association, Inc., and Montauk Beach Preservation Association, Inc. (collectively, the "Intervenors") to intervene as Defendants in the Removed Action. The Intervenors represent three groups comprised of 110 cooperative unit owners and 5 hotel and motel owners who own a combined "2,900 lineal feet of oceanfront property directly affected by the [Project]." (Intervenors' Answer, 15-cv-2349, Dkt. No. 15, at ¶ 1.)

On June 1, 2015, the Intervenors filed an answer to the amended complaint and a purported counterclaim against the Plaintiffs seeking a judgment dismissing the amended complaint and holding the Plaintiffs "personally liable for any damages that occur, both physical and monetary as a result of loss of income should the planned [P]roject not proceed." (Id. at ¶ 8.)

From June 23, 2015 to July 23, 2015, the Removed Defendants filed four separate motions pursuant to Fed. R. Civ. P. 12 to dismiss the amended complaint.

As noted, on October 1, 2015, the day that the Corps and H&L were scheduled to begin mobilizing construction equipment, the Plaintiffs filed a motion for a TRO pursuant to Fed. R. Civ. P. 65 to prevent construction on the Project from commencing until February 15, 2015. By order to show cause, the Plaintiffs also filed a request for a preliminary injunction pursuant to Fed. R. Civ. P. 65 seeking essentially the same relief as the TRO.

On October 1, 2015, the Court held a hearing during which it denied the Plaintiffs' request for a TRO and requested further briefing as to whether a preliminary injunction should issue.

On October 2, 2015, the Court referred the matter to United States Magistrate Judge Anne Y. Shields to hold a hearing, if necessary, and for a recommendation as to whether the Court should grant the Plaintiffs' motion for a preliminary injunction.

### 2. The Federal Action

On October 2, 2015, the Plaintiffs Defend H20, Costanzo, Daniel and Paul Lester, and Miller commenced the Federal Action against the Removed Defendants, as well as Col. David Caldwell, in his official capacity as Commander of the New York District of the Corps, and Commissioner Marc Gerstman, in his official capacity as Commissioner of the DEC (together with the Removed Defendants, the "Defendants").

On October 5, 2015, the Plaintiffs in the Federal Action filed an amended complaint incorporating the same facts alleged in the amended complaint filed in the Removed Action. However, they added new claims pursuant to the Federal Administrative Procedure Act, 5 U.S.C. § 701–06 (the "APA"). (See Am. Compl., 15-cv-5735, Dkt. No. 2, at ¶¶ 76–111.)

On October 9, 2015, Judge Shields held a status conference to discuss the most procedurally efficient manner to move forward with the Removed and Federal Actions. At the conference, the Plaintiffs made clear that the Federal Action incorporates all of the claims alleged in the first filed Removed Action and adds federal APA claims based on the same allegations. (See Oct. 9, 2015 Minute Order, 15-cv-2349, Dkt. No 66.) They also made it clear that the only party from whom they are seeking preliminary relief is the Corps because the Corps is solely responsible for scheduling and overseeing the construction of the Project. (See id.)

Based on these representations, Judge Shields proposed, and the parties agreed to stipulate to the following:

- The Removed Action shall be closed, and the motions pending in that action be terminated without prejudice to renewing those motions in the Federal Action following the disposition of the Plaintiffs' motion for a preliminary injunction;
- The preliminary injunction motion, which was briefed in the context of the Removed Action, shall proceed under the docket number assigned to the Federal Action;
- The Corps was granted additional time to submit papers in further support of its opposition to the Plaintiffs' motion for preliminary injunction so that it could address whether the Plaintiffs would be entitled to injunctive relief pursuant to the new federal claims asserted against it in the Federal Action;
- While the Plaintiffs supplied the Defendants with courtesy copies of the amended complaint in the Federal Action, the provision of such papers was not deemed service of those papers; and
- The Defendants were not required to file an answer or otherwise move in the Federal Action until 30 days after service was made, or 30 days after a decision on the motion for preliminary injunction, whichever is later.

(See id.)

On October 13, 2015, in compliance with the above-Order, the Corps submitted a letter to the Court supplementing its opposition to the Plaintiffs' motion and addressing the Plaintiffs' newly asserted federal APA claims. (Corps' Oct. 13, 2015 Ltr., 15-cv-5735, Dkt. No. 13.)

### 3. The Report and Recommendation

On October 15, 2015, Judge Shields issued a report and recommendation recommending that the Court (i) direct the Clerk of the Court to close the Removed Action under docket number 15-cv-2349, and terminate, without prejudice, the pending motions to dismiss under docket numbers 19, 21, 25, 26, and 29; (ii) deny the Plaintiffs' motion for a preliminary injunction under docket number 54 in the Removed Action; and (iii) deny the Plaintiffs' request for an evidentiary hearing.  (October 15, 2015 Report & Recommendation, 15-cv-2349, Dkt. No. 72 ("R&R"), at 34.)

Judge Shields recommended that the Plaintiffs' motion for preliminary injunction be denied based on the following findings: (i) the doctrine of laches barred the Plaintiff from seeking preliminary relief, id. at 29–30; (ii) the Plaintiffs failed to show irreparable harm, id. at 31–33; (iii) the balance of equities and the public interest weighed heavily against an order enjoining construction on the Project, id. at 33–34; and (iv) the Plaintiffs failed to demonstrate a likelihood of success on their Article 78 and APA claims, id. at 23–29.

Presently before the Court are the Plaintiffs' objections to Judge Shields' recommendations that the Court should deny the Plaintiffs' motion for a preliminary injunction and request for an evidentiary hearing.  For the reasons set forth below, the Court finds the Plaintiffs' objections to be without merit and adopts the R&R in its entirety.

# II. DISCUSSION

## A. The Legal Standards

### 1. Standard of Review

In reviewing a Report and Recommendation, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

The district court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, "[t]he district court is 'permitted to adopt those sections of a magistrate judge's report to which no specific objection is made, so long as those sections are not facially erroneous.'" Sasmor v. Powell, No. 11 CIV. 4645 KAM JO, 2015 WL 5458020, at *2 (E.D.N.Y. Sept. 17, 2015) (quoting Batista v. Walker, No. 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995)); see also Zaretsky v. Maxi-Aids, Inc., No. 10-CV-3771 (SJF) (ETB), 2012 WL 2345181, at *1 (E.D.N.Y. June 18, 2012) aff'd, 529 F. App'x 97 (2d Cir. 2013) ("To accept the report and recommendation of a magistrate judge to which no timely objection has been made, the district judge need only be satisfied that there is no clear error apparent on the face of the record.").

### 2. The Preliminary Injunction Standard

A plaintiff seeking a preliminary injunction pursuant to Fed. R. Civ. P. 65 must establish that: (i) "he is likely to succeed on the merits"; (ii) "he is likely to suffer irreparable harm in the absence of preliminary relief"; (iii) "the balance of equities tips in his favor"; and (iv) "an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008)

As to the first factor, the Second Circuit has adopted a somewhat more flexible standard than "likely to succeed on the merits" — namely, that a party seeking a preliminary injunction must show "(1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Citigroup Glob. Markets, Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010); see also UBS Fin. Servs., Inc. v. W. Virginia Univ. Hosps., Inc., 660 F.3d 643, 648 (2d Cir. 2011) (same). The latter "fair ground for litigation" standard is more flexible than the former "likelihood of success" standard because it "permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." VCG Special Opportunities Master Fund Ltd., 598 F.3d at 35.

However, as Judge Shields correctly noted, the Second Circuit has held that the less rigorous "fair ground for litigation" standard is not available where, as here, "the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme." Id. at n. 4; see also Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs., 769 F.3d 105, 110 (2d Cir. 2014) ("A plaintiff cannot rely on the 'fair-ground-for-litigation' alternative to challenge 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme.'") (quoting Plaza Health Labs., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir. 1989)). That is because "'governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Id. (quoting Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995)).

Thus, in order to obtain a preliminary injunction, the Plaintiffs must show that they are likely to succeed on the merits of their claims, in addition to the other three elements of the preliminary injunction standard.

## B. As to the Recommendation to Close the Removal Action

As an initial matter, the Court notes that at the October 7, 2015 conference, Judge Shields proposed, and the parties agreed to: (i) close the Removed Action, 15-cv-2349; (ii) terminate without prejudice the Defendants' motions to dismiss pending in the Removal Action; and (iii) stay the time in which the Defendants were required to file an answer or otherwise move in the Federal Action until thirty days after service was made, or thirty days after a decision on the motion for preliminary injunction, whichever is later. (See Oct. 9, 2015 Minute Order, 15-cv-2349, Dkt. No 66.)

The reason that Judge Shields proposed this stipulation was to avoid the unnecessary cost and delay that would likely result from proceeding with both the Federal Action and the Removal Actions when the Federal Action alleges APA claims based on the exact same set facts that the Plaintiffs allege in the Removal Action.

In light of the parties' stipulation and in the interest of efficiency, the Court finds no clear error in the recommendation by Judge Shields to close the Removal Action and terminate the pending motions to dismiss without prejudice and with leave to refile in the Federal Action. Accordingly, the Court adopts this recommendation in its entirety.

The Court further notes that the termination of the Removal action will also result in the dismissal without prejudice of the counterclaim filed by the Intervenors against the Plaintiffs. (See Verified Answer, 15-cv-2349, Dkt. No. 15.) If the Intervenors wish to re-assert their counterclaim, they may move to intervene in the Federal Action.

## C. As to the Request for an Evidentiary Hearing

Judge Shields also found that no evidentiary hearing was necessary because the Plaintiffs failed to raise a dispute of fact as to any of the four elements of the preliminary injunction standard. (See R&R at 5–6.) The Court agrees.

"On a motion for preliminary injunction, where 'essential facts are in dispute, there must be a hearing . . . and appropriate findings of fact must be made.'" Republic of Philippines v. New York Land Co., 852 F.2d 33, 37 (2d Cir. 1988) (quoting Fengler v. Numismatic Americana, Inc., 832 F.2d 745, 747 (2d Cir. 1987) (alteration omitted).

However, "[i]t is not a rigid requirement that oral testimony be taken on a motion for a preliminary injunction." Id. (citing Redac Project 6426, Inc. v. Allstate Ins. Co., 402 F.2d 789, 790 (2d Cir. 1968)). Significantly, "[a]n evidentiary hearing is not required when the relevant facts either are not in dispute or have been clearly demonstrated at prior stages of the case . . . or when the disputed facts are amenable to complete resolution on a paper record." Charette v. Town of Oyster Bay, 159 F.3d 749, 755 (2d Cir. 1998); see also Dress for Success Worldwide v. Dress 4 Success, 589 F. Supp. 2d 351, 357 (S.D.N.Y. 2008) ("There is no hard and fast rule in this circuit that oral testimony must be taken on a motion for a preliminary injunction or that the court can in no circumstances dispose of the motion on the papers before it.") (quoting Consol. Gold Fields PLC v. Minorco, S.A., 871 F.2d 252, 256 (2d Cir. 1989) (alteration omitted)).

Here, the Plaintiffs' motion for a preliminary injunction is premised on their claims that the Corps violated the APA in determining that (i) the Project was "consistent to the maximum extent practicable" with the East Hampton LWRP and (ii) issuing a FONSI statement under NEPA in which it concluded that the construction of the Project would result in no significant adverse environmental impacts. (See Pls.' Mem. of Law, 15-cv-2349, Dkt. No. 15, at 1–2.) The

only evidence that the Plaintiffs offered in support of their motion for preliminary relief was an affidavit by Kevin McAllister ("McAllister"), an individual who has a Master's Degree of Science degree in Coastal Zone Management and "contributed to the drafting of the [East Hampton] LWRP." (McAllister Decl., 15-cv-2349, Dkt. No. 54–3, at ¶ 6.)

On the other hand, the Corps offered documentary evidence, including, drafts and final versions of the EA and FONSI statements; copies of the public comments to those documents; and the determinations by the Corps, the DEC, and East Hampton that the Project was consistent with the East Hampton LWRP. As is explained in detail below, the Court finds that these documents clearly show that the Corps followed the required procedures under the CZMA and NEPA. (See Cortes Decl., 15-cv-2349, Dkt. No. 41, Exs. 1–5.)

In addition, the Corps offered the declarations of (i) Frank Verga ("Verga"), a Project Manager at the Corps responsible for the Project; (ii) Kevin Merenda ("Merenda"), a Resident Engineer at the Corps who also works on the Project; and (iii) Susan D. McCormick, P.E., ("McCormick"), the Chief of the Coastal Erosion Management Program for the DEC. (See Cortes Decl., 15-cv-2349, Dkt. No. 58.)

Judge Shields concluded that the Corps' determination that the Project was consistent with the East Hampton LWRP and did not result in significant impacts to the environment. As explained below, the Court finds this conclusion to be well-supported by the undisputed documentary evidence in the record. Thus, the Court agrees with the conclusion by Judge Shields that the Plaintiffs' allegations, supported only by the McAllister affidavit, were not sufficient to create a dispute of fact as to any of the elements of the preliminary injunction standard, and thus did not merit a separate evidentiary hearing.

In their objections, the Plaintiffs attempt to create an issue of fact by offering additional evidence in the form of (i) an unsworn letter by Steven Resler ("Resler"), a Coastal Resource Specialist at the DOS and purported expert in "coastal management"; and (ii) what the Plaintiffs call "pre-filed" testimony by Resler from a 1995 case, which the Plaintiffs contend is "factually similar" to the instant case. (See Irace Decl., 15-cv-2349, Dkt. No. 76, Exs. A, B.)

As is explained more fully below, the Court finds this additional evidence to be improper and not persuasive when viewed in light of the undisputed documentary evidence before the Court and the independent defense of laches.

Accordingly, the Court, upon a *de novo* review of the evidence, finds the decision by Judge Shields to deny an evidentiary hearing to be entirely correct, and adopts her recommendation on that issue. See, e.g., Drywall Tapers & Pointers of Greater New York, Local 1974 of I.B.P.A.T., AFL-CIO v. Local 530 of Operative Plasterers & Cement Masons Int'l Ass'n, 954 F.2d 69, 76-77 (2d Cir. 1992) ("No hearing was necessary here because 'the prior hearings and affidavits, and the court's findings supporting the earlier injunction, provided an adequate basis for the court's decision. The most significant factors [on which the injunction was based] . . . would have remained essentially unchanged by any additional evidence.'") (quoting Republic of the Philippines, 852 F.2d at 37); Hybred Int'l v. Thorne Legal, Inc., No. CV-08-4343 (CPS) (KAM), 2008 WL 5068896, at *5 (E.D.N.Y. Nov. 24, 2008) ("A [preliminary injunction evidentiary] hearing is not necessary, however, when a movant does not make a sufficient showing of irreparable harm, when credibility is at issue, when the right to a hearing has been waived, and when additional evidence will not change the court's finding . . . . In this case, even accepting plaintiffs' well-pleaded allegations in the complaint as true, they are not entitled to relief as a matter of law.") (emphasis added) (citing Dodge v. County of Orange, 208 F.R.D. 79,

86 (S.D.N.Y. 2002)); Brownell v. City of Rochester, 190 F. Supp. 2d 472, 483 (W.D.N.Y. 2001) ("I agree that no hearing [on a preliminary injunction motion] is necessary here. The essential facts of these cases are not in dispute.").

### D. As to the Doctrine of Laches

The Plaintiffs object to Judge Shields' finding that laches bars their claim for preliminary relief.

"Laches is an equitable defense which bars injunctive relief where a plaintiff unreasonably delays in commencing an action." Tri-Star Pictures, Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir. 1994) (citing Stone v. Williams, 873 F.2d 620, 623 (2d Cir. 1989)). "A party asserting the defense of laches must establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998).

In cases where a plaintiff alleges that a defendant failed to comply with NEPA, courts have stated that "laches is a doctrine of equity that is only rarely invoked in environmental cases, on account of the strong public interest in effecting compliance with NEPA." Nat. Res. Def. Council, Inc. v. U.S. Army Corps of Engineers, 399 F. Supp. 2d 386, 402 (S.D.N.Y. 2005) (Rochester v. United States Postal Service, 541 F.2d 967, 977 (2d Cir. 1976)).

In such cases, "[t]he Second Circuit test is whether the plaintiff's delay in bringing the suit has resulted in construction proceeding 'to a point where any significant environmental damage has already been done' and whether, in the alternative, 'construction may have gone so far that for economic reasons it would be impracticable or impossible to alter much of the basic plan.'" Riverdale Envtl. Action Comm. Along the Hudson--R.E.A.C.H. v. Metro. Transp. Auth.,

638 F. Supp. 99, 102-03 (S.D.N.Y. 1986) (quoting <u>Steubing v. Brinegar</u>, 511 F.2d 489, 495 (2d Cir. 1975)).

For example in <u>Nat. Res. Def. Council, Inc. v. U.S. Army Corps of Engineers</u>, *supra* at 377–88, the plaintiffs, a group of environmentalists and concerned citizens, challenged the Corps' decision to deepen shipping channels in the New York-New Jersey harbor, alleging that the Corps was arbitrary and capricious in failing to prepare a supplemental EIS relating to the possible effects of its project on a recently announced study by the Environmental Protection Agency ("EPA"). Although the plaintiffs waited a year after the EPA announced the study to initiate their lawsuit, the court found that the delay was not unreasonable because during that period, "plaintiffs repeatedly attempted to resolve their concerns with the Army Corps and the EPA through negotiation." <u>Id.</u> at 402. In addition, given that construction on the facility had not yet begun, the court did not find that the Corps was prejudiced in delaying the project further. <u>See</u> <u>id.</u> Accordingly, the court found the doctrine of laches was inapplicable to the plaintiffs' case. <u>Id.</u>; <u>see also</u> <u>Steubing v. Brinegar</u>, 511 F.2d 489, 496 (2d Cir. 1975) ("[B]ecause the bridge was such a large project and in such an early stage of construction, the possible environmental savings resulting from requiring an EIS seemed to outweigh the detriment defendants and third parties might suffer as a result of any delay on the part of plaintiffs in bringing this action.").

By contrast, in <u>Riverdale Envtl. Action Comm. Along the Hudson--R.E.A.C.H. v. Metro. Transp. Auth.</u>, *supra* at 100–101, the plaintiffs, also a group of individuals and community organizations, sought to preliminarily enjoin the construction of metro commuter line power substations based on their claim that the decision by the defendant-transportation authority to issue a FONSI statement was arbitrary and capricious and in violation of the APA. In considering the viability of a laches defense, the court found that the plaintiffs evidenced a lack

of diligence because they "were fully aware of and participated in planning discussions regarding these substations, yet they ha[d] waited eighteen months to bring this suit." Id. at 103. In addition, the court found that the defendant was prejudiced by the plaintiffs' delay because "over $67 million has already been invested in the project; $56 million of which has been spent." Id. Had the plaintiffs brought suit immediately after the defendant had issued an EA, the court found that "the planning and construction would not have progressed so far as to make it impracticable to delay the development of the site and other sites until an EIS, if needed, could be prepared." Id. Accordingly, the court found laches to be applicable and denied the plaintiffs' request for preliminary relief. Id.

Similarly in City of Rochester v. U.S. Postal Serv., 541 F.2d 967, 976 (2d Cir. 1976), the Second Circuit found that laches precluded the requests by a group of plaintiffs for a preliminary injunction to halt construction by the postal service of a new facility. The court reasoned that the plaintiffs had waited more than a year after they became aware of the project to commence a lawsuit and by that time "construction was 18 percent completed." Id. at 977. As such, the court found that "construction has proceeded to a point where it is impractical for economic reasons to enjoin further development of the Henrietta site." Id.; see also L.S.S. Leasing Corp. v. U.S. Gen. Servs. Admin., 579 F. Supp. 1565, 1572 n. 8 (S.D.N.Y. 1984) (finding laches precluded injunctive relief in an environmental suit where the plaintiffs waited over three years from the date when the final impact statement was published to initiate suit, failed to lodge their objections in the administrative process, and caused undue prejudice to the defendants because they had spent 5% of a $93 million and would incur "additional shut-down and start-up costs . . . if the project were forced to stop").

Here, Judge Shields found that the Plaintiffs were aware as early as April 2015 that the Corps was going to commence construction on the Project in October 2015, and yet decided to wait until October 1, 2015, after preparations for the project were well underway, to file a motion for a preliminary injunction. The Plaintiffs do not appear to object to this finding, and the Court finds, even under a *de novo* review, that it is supported by the record in this case.

On April 24, 2015, the Corps filed a letter with the Court on ECF clearly representing, "The construction work on the Beach Stabilization Project is not scheduled to commence until the Fall of 2015." (Apr. 24, 2015 Ltr., Dkt. No. 2.) Further, on August 24, 2015, the Plaintiffs filed a motion pursuant to Fed. R. Civ. P. 15 for leave to amend the Removal Action complaint for a second time. (See the Pls.' Mem. of Law, 15-cv-2349, Dkt. No. 29.) In their memorandum, they also clearly indicated an awareness of the construction schedule set by the Corps — "the Corps has agreed that construction is not scheduled to begin until early October 2015." (Id. at 7.) Based on this evidence, the Plaintiffs satisfied the first element of laches — namely, that the Plaintiffs knew as early as April 2015 that the Project was going to commence in October 2015.

Judge Shields' finding as to the second element of laches — namely, the plaintiff inexcusably delayed in taking action — is also well-supported by the record. There is no question that the Plaintiffs' sat on their rights for at least five months and waited until October 1, 2015, the day that construction on the Project was scheduled to commence, to make a motion for preliminary injunction.

In that regard, the Court finds significant the undisputed fact that the Plaintiffs failed to make their objections to the Project known to the Corps by participating in the administrative approval process in September 2014, when the Corps released the draft EA and FONSI for

public review.  Had they done so, it is possible that the Corps could have addressed some of the Plaintiffs' objections prior to undertaking the extensive preparation efforts described below. Instead, the Plaintiffs did not participate in the public comment period or try to resolve their objections without litigation; waited six months to initiate suit against the Corps; and then waited another five months to request preliminary relief.  These undisputed facts weigh heavily in favor a finding of laches.  See L.S.S. Leasing Corp., 579 F. Supp. at 1573 ("The defendants also claim that the laundry list of objections to the FEIS should properly have been raised during the administrative phase of the proceedings and that the failure to raise them then, bars the plaintiffs from raising them now.  If these alleged omissions are indeed significant, as the plaintiffs contend, they should certainly have been raised during the administrative process.").

The Plaintiffs made various assertions before Judge Shields to excuse their delay.  They asserted, without providing any evidence, that "the first time [the] Plaintiffs received the Corps' Consistency Statement using the LWRP policies was on July 23, 2015."  (Id. at 5.)  However, the August 11, 2014 consistency statement was referenced in and attached as Attachment E to the draft EA, which as noted above, was made publicly available by the Corps on August 26, 2014. (See Cortes Decl., 15-cv-2349, Dkt. No. 41.)  Further, their contention is contradicted by the fact that their March 19, 2015 complaint explicitly references the consistency determination.  (See Verified Petition, Dkt. No. 1, at ¶ 130.)  Thus, at the very least, the Corps was aware of the determination as early as March 19, 2015, and still waited almost six months to file a motion for a preliminary injunction.

They also attempted to excuse their delay by making unsupported statements in their legal memorandum that the Defendants failed to properly respond to their apparent November 24, 2014 requests under the Freedom of Information Law ("FOIL") for information related to the

Project.  (See the Pls.' Reply Mem. of Law at 4–5.)  However, the Plaintiffs do not annex these supposed FOIL requests and fail to explain how the information sought in those requests was relevant to their claims for preliminary relief.  Indeed, the Court notes that the documents that form the basis of their claims — the EA, the FONSI statement, and the consistency determination — were already publicly available as of August 26, 2014. (See Cortes Decl., 15-cv-2349, Dkt. No. 41.)  Thus, the Court finds the Plaintiffs' claim that the Defendants' responses to their FOIL requests were necessary for them to initiate their lawsuit to be speculative and unsupported.

In their objections, the Plaintiffs also attempt to excuse their delay because they assert that "[t]his is a complicated matter involving four distinct government agencies, at four different levels of government . . . [and] has required significant litigation to fend off Motions to Dismiss from each of the four agencies."  (The Pls.' Objections, Dkt. No. 75, at 18–19.)

The Plaintiffs cite to no legal authority holding that a litigant can be absolved from the consequences of a significant delay in requesting preliminary relief because the matter is "complicated," and the Court declines to adopt such an argument.  Almost every litigation involves complicated questions.  Were the Court to recognize the supposed complicated nature of a case as an excuse for a plaintiff to make an eleventh hour request for preliminary relief, it would render laches inapplicable in almost every case and severely prejudice defendants who may have already taken costly actions to proceed with the challenged activity during the period of the plaintiff's delay.  Thus, the Court finds the excuse offered by Plaintiffs to be unpersuasive.

Finally, the Plaintiffs assert that their delay should be excused because they "were still trying to resolve this at the administrative level in later September, through the County

31

Legislature." (The Pls.' Objections, Dkt. No. 75, at 18–19.)  Again, the Court declines to find this unsupported and vague allegation to be a valid excuse for the Plaintiffs' delay.

Accordingly, the Court concludes, upon a *de novo* review, that Judge Shields' finding that the Plaintiffs satisfied the first two elements of laches — namely, that they knew of the defendant's misconduct and inexcusably delayed in taking action — to be well-supported by the record in this case.

The Plaintiffs do not object to the finding by Judge Shields that the Defendants were prejudiced by the Plaintiffs' delay and therefore, satisfied the third element of the Laches defense.  Thus, the Corps contends that the Plaintiffs waived any objections to this finding.  (See the Corps' Opp'n to the Pls.'Objections Mem. of Law, 15-cv-2349, Dkt. No. 79, at 8.)

The Court need not decide the question of waiver as it finds that even under *de novo* review, Judge Shields' finding of prejudice was clearly supported by the record. Specifically, the Defendants offer a declaration by Meranda, who, as noted above is the Resident Engineer and Administrative Contracting Officer for the Project, in which he stated that H&L Contracting has already mobilized its equipment and begun construction on the Project.  As such, the Corps is obligated to pay H&L Contracting $600,000 under the agreement, which is non-refundable. (Meranda Decl., 15-cv-2349, Dkt. No. 58, at ¶ 8.)  Further, since H&L has already mobilized its equipment and personnel, the Corps is obligated to pay H&L an additional $6,700 per day as of October 1, 2015 for labor and costs associated with the Construction.  (Meranda Decl., 15-cv-2349, Dkt. No. 58, at ¶ 8.)

Therefore, any attempt to stop construction at this point would potentially waste the more than $600,000 the Corps has already spent to date on the Project.  (Id.)  In addition, Meranda estimated that if construction were delayed until February 2015 to resolve the Plaintiffs'

32

objections to the Project, H&L would have to de-mobilize and re-mobilize its equipment, which would cost the Corps another $500,000. (Meranda Decl., 15-cv-2349, Dkt. No. 58, at ¶ 8.) Had the Plaintiffs filed a motion for preliminary relief prior to the Corps mobilizing its equipment and beginning construction on the Project, all of these costs, which could exceed more than $1.1 million, may have been avoided.

Based on this undisputed evidence, the Court finds that construction on the Project has gone far enough that for economic reasons, it would be impractical and wasteful to delay it any further by granting the Plaintiffs' request. See City of Rochester, 541 F 2d at 976 (finding prejudice where "construction was 18 per cent completed"); L.S.S. Leasing Corp., 579 F. Supp. at 1573 (finding that the plaintiffs' delay in seeking preliminary relief resulted in prejudice to the defendant because "approximately 5% of the total $93 million budget for the new building has been spent and might be wasted if construction were forced to stop" and "there are the additional shut-down and start-up costs that would be incurred if the project were forced to stop").

In sum, the Court concludes that (i) the Plaintiffs were aware as early as April 2015 that construction on the Project was scheduled to commence in October 2015 and waited until October 1, 2015 to make their motion for a preliminary injunction to stop construction; (ii) the Plaintiffs offered no legitimate excuse for their delay; and (iii) the Corps was unduly prejudiced by the Plaintiffs' delay because by the time the Plaintiffs moved for preliminary relief, the Corps had entered into an agreement with a contractor**;** the contractor had mobilized their construction equipment on the beach; and the Corps has paid the contractor more than $600,000 which is not refundable. Therefore, the Court adopts Judge Shields' recommendation and finds that the Plaintiffs' motion for a preliminary injunction is barred by laches.

**E. As to Irreparable Harm and the Public Interest**

As noted earlier, in deciding a motion for a preliminary injunction, "the court must consider whether the plaintiff will suffer irreparable harm in the absence of a preliminary injunction, and the court must assess the balance of hardships between the plaintiff and defendant." Salinger v. Colting, 607 F.3d 68, 81 (2d Cir. 2010)

"A showing of irreparable harm is 'the single most important prerequisite for the issuance of a preliminary injunction.'" Faiveley Transp. Malmo AB v. Wabtec Corp., 559 F.3d 110, 118 (2d Cir. 2009) (quoting Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999)). Accordingly, "'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered.'" Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 234 (2d Cir. 1999) (quoting Reuters Ltd. v. United Press Int'l, Inc., 903 F.2d 904, 907 (2d Cir. 1990)). In that regard, "[t]he movant must demonstrate an injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" Id. (quoting Shapiro v. Cadman Towers, Inc., 51 F.3d 328, 332 (2d Cir. 1995)).

Before Judge Shields, the Plaintiffs asserted that construction of the Project would cause them irreparable harm because its construction would "render[] the entire beach of downtown Montauk unusable and unenjoyable" and cause "permanent and irreversible" effects to the environment. (The Pls.' Mem. of Law, 15-cv-2349, Dkt. No. 54, at 17–18.)

The only evidence that the Plaintiffs offered in support of this assertion was a declaration filed by McAllister, whose qualifications include a Master's of Science Degree in Coastal Zone Management and having participated in drafting the East Hampton LWRP. (McAllister Decl., 15-cv-2349, Dkt. No. 54–3, at ¶¶ 1–5.) In his declaration, McAllister states that the construction

of the Project will, among other things, harm: (i) "environmental interests because it will disrupt natural processes that are most effective in preventing erosion and flooding"; (ii) "aesthetic interests" by "[r]eplacing the beach and dune system with 14,000 geobags"; (iii) "ecological interests" by eliminating "nearshore habitat essential to some avian and aquatic species"; and (iv) "economic interests" by causing property values to decrease near the Project and affecting individuals whose occupations rely on the beach area adjacent to the Project.  (Id. at ¶¶ 27–53.)

Judge Shields found the opinions offered by McAllister were insufficient to demonstrate irreparable harm because the Plaintiffs failed to show that McAllister was qualified to give an opinion as to either coastal management or economic harm.  (R&R at 32–33.)  Further, she found that even if McAllister was qualified to render an opinion as to the economic and environmental effects of the Project on Montauk beach, his opinion did nothing more than express disagreement with the well-supported opinion offered by the Corps.  (Id. at 33.)  Thus, she found that, without more, the McAllister declaration was "insufficient to support a claim of irreparable harm."  (Id. at 32–33.)

In addition, Judge Shields found that the Plaintiffs' five month delay in seeking preliminary relief weighed heavily against a finding of irreparable harm.  (Id. at 31.)  Further, she found that the Defendants would be financially prejudiced by granting a preliminary injunction and that the public interest weighed heavily against halting the construction of the Project.  (Id. at 33–34.)  Therefore, she found that the "balance of equities and the public interest also weigh heavily against an order enjoining the Project from going forward."  (Id. at 33.)

Although not entirely clear from the Plaintiffs' brief, it appears that they object to Judge Shields' finding that the Plaintiffs did not establish irreparable harm because they assert that her conclusion "misses the broader negative socioeconomic effects of replacing Montauk's premier

attraction white sand beaches, in its downtown area, with 14,000 geo-bags." (The Pls.'
Objections at 18.) The Plaintiff further asserts that Judge Shields erred in rejecting the Plaintiffs'
claim that the Project would render the beach unusable. (Id.)

The Plaintiffs' objections largely reiterate the arguments made to, and rejected by, Judge
Shields. Thus, the Court reviews for clear error the determination by Judge Shields that the
Plaintiffs failed to show irreparable harm and that the balance of equities weighs heavily in favor
of a preliminary injunction. See Assenheimer v. Comm'r of Soc. Sec., No. 13 CIV. 8825 (ER)
(SN), 2015 WL 5707164, at *2 (S.D.N.Y. Sept. 29, 2015) ("The district court will also review
the report and recommendation for clear error where a party's objections are 'merely perfunctory
responses' argued in an attempt to 'engage the district court in a rehashing of the same
arguments set forth in the original petition.'").

After reviewing the record, the Court finds that there was no clear error, and Judge
Shields' conclusions were entirely correct.

First, Judge Shields correctly attached only slight weight to the declaration filed by
McCallister. McAllister had no personal involvement with the Project and fails to explain how
he came to his conclusions or why the fact that he has a Master's in Science qualifies him to
make judgments about the economic effects of the Project on the Montauk community. See
Pogliani v. U.S. Army Corps of Engineers, 166 F. Supp. 2d 673, 690 (N.D.N.Y. 2001) ("In short,
the observations, opinions and sentiment espoused by these affiants are simply insufficient to
demonstrate that irreparable environmental harm or damage to historical properties will occur if
construction of the power plant is not halted. In many cases, the facts and opinions which appear
in the affidavits are not based on personal knowledge while those facts and opinions which are in
admissible form are irrelevant to the legal analysis herein.").

Second, as Judge Shields noted, even if the Court were to credit the opinion of McAllister, his opinions are contrary to the conclusions reached by the Corps that the Project would have no significant impact on the environment and would not impede the public's access to the beach, which were based on a study in coordination with federal and state agencies as well as public comments.  (See Cortes Decl., 15-cv-2349, Dkt. No. 25, Ex. A.)

Therefore, at most, the opinions offered by McAllister suggest the "mere possibility" of harm to the beach, which falls manifestly short of the standard required for preliminary injunctive relief.  See Pogliani, 66 F. Supp. 2d at 690 ("Even if Mr. Downs was qualified as an expert in these areas, his conclusory concerns regarding harm to plants, animals and 'sensitive" wetlands 'in the vicinity' of construction are insufficient to demonstrate that any damage to plant or animal life will actually occur or if so, how it will occur. 'An injunction 'may not be used simply to eliminate a possibility of a remote future injury.'") (quoting Carey v. Klutznick, 637 F.2d 834, 837 (2d Cir. 1980)).

Third, Judge Shields correctly noted that in addition to the complete lack of evidence supporting the Plaintiffs' claim of irreparable harm, the undisputed fact that they waited five months before making a motion for a preliminary injunction also weighs heavily against a finding of irreparable harm.  That is because "[p]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiff's rights," and "[d]elay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action."  Silber v. Barbara's Bakery, Inc., 950 F. Supp. 2d 432, 439 (E.D.N.Y. 2013) (quoting Central Point Software, Inc. v. Global Software & Accessories, Inc., 859 F. Supp. 640, 644–45 (E.D.N.Y. 1994)); see also Weight Watchers Int'l, Inc. v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005) ("We have found delays of as little as ten weeks sufficient

to defeat the presumption of irreparable harm that is essential to the issuance of a preliminary injunction."); Citibank, N.A. v. Citytrust, 756 F.2d 273, 276 (2d Cir. 1985) ("Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction.")

"Where there is a good reason for it," courts have found short delays by plaintiffs in moving for preliminary relief do not bar a finding of irreparable harm. Weight Watchers Int'l, Inc. v. Luigino's, Inc., 423 F.3d 137, 144 (2d Cir. 2005). For example, in Tom Doherty Associates, Inc. v. Saban Entm't, Inc., 60 F.3d 27, 40 (2d Cir. 1995), the Second Circuit found a delay of four months to be reasonable where the record showed that the plaintiff only definitively learned about the defendant's misconduct a few weeks before filing suit, and the defendants had not taken costly steps which would be undone by preliminary relief. See id.

Here, the Plaintiffs provide no "good reason" for why they waited five months from when they initiated the Removal Action to seek preliminary relief. Indeed, as explained earlier, all the evidence suggests that despite being aware that construction of the Project was scheduled to commence in the Fall of 2015, they waited until the day that construction was to start to make their motion. This fact alone supports the denial of their motion. See Silber, 950 F. Supp. 2d at 439 ("While delay does not always undermine an alleged need for preliminary relief, months-long delays in seeking preliminary injunctions have repeatedly been held by courts in the Second Circuit to undercut the sense of urgency accompanying a motion for preliminary relief.") (collecting cases).

Finally, the Court finds no error in Judge Shields' finding that the balance of the equities weighs heavily against granting a preliminary injunction. That is because the Plaintiffs have

shown little more than the possibility that the Project would harm the Beach. On the other hand, the Corps has offered undisputed evidence, which, as discussed earlier, shows that the Corps will have to pay H&L Contracting $6,700 per day during any halt of construction, $600,000 to the extent that H&L Contracting is required to remove their equipment from Montauk beach, and an additional $500,000 if they are forced to re-mobilize their equipment after the injunction ends. The possibility that the Corps would have to pay upwards of $1.1 million in costs as a result of the injunction establishes clear and substantial prejudice, which weighs against granting the Plaintiffs' motion.

Further, and perhaps more importantly, the Corps has also offered substantial evidence suggesting that in the wake of Hurricane Sandy, Downtown Montauk is in need of immediate flood control measures. In particular, in the final EA, the Corps concluded, after undertaking an extensive study of the Montauk beach conditions, that the Project "is required to provide adequate protection from severe storms and address the vulnerability of the project area." (The Final Report, Dkt. No. 41-6, at 9–10.) Further, both Verga and McCormick, the Chief of Coastal Erosion Management Program for the DEC, stated that even a short-term delay in the Project is an unacceptable result because "[w]ithout this project, Montauk's residents, businesses, and infrastructure will be more vulnerable and will likely sustain greater damages when the next hurricane or major storm hits Long Island." (McCormick Decl., 15-cv-2349, Dkt. No.58–10 at ¶ 8; see also Verga Decl., 15-cv-2349, Dkt. No. 58–8, at ¶ 19.)

Indeed, the Intervenors, which represent the owners of approximately 2,900 lineal feet of oceanfront property directly affected by the Project and a majority of the large hotel and motel facilities in Montauk, have filed an answer in this matter expressly concurring with the assessment by the Corps and indicating that failure to go forward with the Project as scheduled

would leave their businesses vulnerable to future storms and threaten the vitality of Downtown Montauk.  (See Verified Answer, 15-cv-2349, Dkt. No. 15, at ¶¶ 1–9.)

When viewing this evidence against the unsupported suppositions of the Plaintiffs and McAllister, the Court finds that Judge Shields was entirely correct in finding that the public interest weighs heavily against even a short-term delay of the Project.

Accordingly, the Court finds no clear error in the conclusion by Judge Shields that the balance of equities weighs heavily against granting a preliminary injunction to halt construction on the Project.

**F. As to the Likelihood of Success**

Judge Shields recommended that the Court deny the Plaintiffs' motion for a preliminary for the additional reason that the Plaintiffs failed to establish that their APA and Article 78 claims against the Corps are likely to succeed.

The Court will now address the Plaintiffs' objections with respect to each claim.

**1. Article 78 of the CPLR**

Article 78 of the CPLR is a state statute that authorizes proceedings in state court against state or local bodies and officers.  See N.Y. Civ. Prac. L. & R. 7801.

Judge Shields concluded that the Plaintiffs' Article 78 claim against the Corps was not likely to succeed because Congress has not waived its sovereign immunity for the United States or it agencies to be sued under Article 78, and therefore, "Article 78 is the wrong procedural vehicle for obtaining review of a decision of the Federal government or any agency thereof." (R&R at 22.)

The Plaintiffs do not object to this finding.  Thus, the Court reviews it for clear error. It is well-established that "'[a]bsent a waiver, sovereign immunity shields the federal Government

and its agencies from suit[.]'" Wake v. United States, 89 F.3d 53, 57 (2d Cir. 1996) (quoting

Dorking Genetics v. United States, 76 F.3d 1261, 1264 (2d Cir. 1996)). "Sovereign immunity is

jurisdictional in nature. Indeed, the 'terms of [the United States'] consent to be sued in any court

define that court's jurisdiction to entertain the suit.'" F.D.I.C. v. Meyer, 510 U.S. 471, 475, 114

S. Ct. 996, 1000, 127 L. Ed. 2d 308 (1994) (quoting United States v. Sherwood, 312 U.S. 584,

586, 61 S.Ct. 767, 770, 85 L.Ed. 1058 (1941)). Thus, it is "axiomatic that the United States may

not be sued without its consent and that the existence of consent is a prerequisite for

jurisdiction." Id. (quoting parenthetically United States v. Mitchell, 463 U.S. 206, 212, 103 S.Ct.

2961, 2965, 77 L.Ed.2d 580 (1983)).

Here, the Plaintiffs point to no legal authority suggesting that Congress has waived

sovereign immunity for the United States or its agencies, such as the Corps, with regard to

Article 78 claims. Indeed, at least one court in this Circuit has concluded that there has been no

such waiver and as a result, dismissed an Article 78 claim against a federal agency. See

Nouredinne v. Admin. for Child & Family, No. 14-CV-03063, 2015 WL 967594, at *3

(E.D.N.Y. Jan. 16, 2015) ("Congress has not waived sovereign immunity for the United States or

its agencies with regard to Article 78. Defendants correctly state that as agencies of the United

States, they cannot be sued under state law without their consent. United States v. Mitchell, 463

U.S. 206, 212 (1983). Thus, Nouredinne cannot maintain an Article 78 proceeding against ACF,

a component of the Department of Health and Human Services, which is a federal executive

branch department.").

Courts have also declined to entertain Article 78 claims on supplemental jurisdiction

grounds because they have concluded that "an Article 78 proceeding is best brought in the state

court," and thus, it is improper for a federal court to entertain such claims. Cartagena v. City of

New York, 257 F. Supp. 2d 708, 709 (S.D.N.Y. 2003) ("The cases that have addressed the issue have consistently declined to exercise supplemental jurisdiction over Article 78 claims.") (collecting cases); see also Morningside Supermarket Corp. v. New York State Dep't of Health, 432 F. Supp. 2d 334, 347 (S.D.N.Y. 2006) ("Federal courts in New York agree that 'Article 78 proceedings were designed for the state courts, and are best suited to adjudication there.'") (quoting Lucchese v. Carboni, 22 F.Supp.2d 256, 258 (S.D.N.Y. 1998)).

Therefore, the Court finds no clear error in the determination by Judge Shields that the Plaintiffs' Article 78 claim against the Corps is not likely to succeed based on their failure to establish that the Corps waived its sovereign immunity from such claims or, in the alternative, that supplemental jurisdiction would be appropriate over their claim.

### 2. The APA

#### a. Legal Standard

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C.A. § 702 (West). "Pursuant to the APA, courts review contested agency action to determine if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" 5 U.S.C. § 706(2)(A). The standard of review is narrow and deferential: "a court is not to substitute its judgment for that of the agency." F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513-14, 129 S. Ct. 1800, 1810, 173 L. Ed. 2d 738 (2009) (quoting Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co., 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)). Further, a court should "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 513-14, 129 S. Ct. 1800, 1810, 173 L. Ed.

2d 738 (2009) (quoting <u>Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.</u>, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

However, although this standard is "highly deferential," the Second Circuit has stated that it "does not equate to no review." <u>Brodsky</u>, 704 F.3d at 119 (quoting <u>Wilson v. CIA</u>, 586 F.3d 171, 185 (2d Cir. 2009)). Rather, a court must "review the administrative record to ensure 'that the agency examined the relevant data and articulated a satisfactory explanation for its action. Moreover, the agency's decision must reveal a rational connection between the facts found and the choice made.'" <u>Id.</u> (quoting <u>Res. Def. Council, Inc. v. U.S. EPA</u>, 658 F.3d 200, 215 (2d Cir. 2011)).

The Court will review, in turn, the Plaintiffs' objections with respect their APA claims arising from (1) the Corps' August 11, 2014 consistency determination pursuant to the CZMA; and (2) the Corps' issuance of an EA and FONSI statement pursuant to NEPA on December 8, 2014.

### b. The August 11, 2014 Consistency Determination

As discussed earlier, the CZMA requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone . . . . be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs." 16 U.S.C. § 1456(c)(1)(A).

An agency ensures the consistency of its proposed actions with approved state coastal management programs, by submitting a "consistency determination to the relevant State agency . . . no . . . later that 90 days before final approval of the Federal activity, unless both the Federal Agency and the State agency agree to a different schedule." 16 U.S.C.A. § 1456(c)(1)(C).

Once a federal agency has issued its consistency determination, the relevant state agency may concur or object to it.  15 C.F.R. § 930.41(a).

On August 11, 2014, the Corps issued a consistency determination to the DOS, the state agency responsible for administering the New York State CMP, stating that the Project was consistent with the CMP and the East Hampton LWRP.  (Cortes Decl., 15-cv-2349, Dkt. No. 25–3.)

On October 24, 2014 and November 3, 2014, respectively, the DOS and East Hampton issued separate letters concurring with the Corps' consistency determination.  (Cortes Decl., 15-cv-2349, Dkt. No. 5, Exs. 2, 6.)

The amended complaint alleges that the Corps' August 11, 2014 consistency determination was "arbitrary and capricious" in violation of the APA because the Project was not consistent to the "maximum extent practicable" with "44 policies of the [East Hampton] LWRP in 29 different ways."  (Am. Compl., 15-cv-5735, at ¶ 79.)

Although they nominally reference other policies, the Plaintiffs' APA claim arises principally from the Corps' determination that the Project was consistent with Policy #17, which provides:

> Whenever possible use non-structural measures to minimize damage to natural resources and property from flooding and erosion.  Such measures shall include: (I) setback of buildings and structures; (II) the planting of vegetation and the installation of sand fencing and draining; (III) the reshaping of bluffs; and (IV) the flood-proofing of buildings of their elevation above the base flood level.

(Id. at 3.)  Similarly, Policy 17A states that "[a]long south shore ocean facing" reach 9, where Project was to be located, "only non-structural measures are permitted to minimize flooding and erosion."  (Id. at 3.)

The Corps found that the Project was consistent with Policies 17 and 17A because:

[t]he project consists of dune reinforcement along 3,100 feet of the shoreline using geotextile bags filled with sand then covered by a minimum of 3 feet of sand . . . . The nourishment of beaches and dunes with appropriate material is an allowable activity pursuant to the coastal erosion hazard area regulations contained in 6 NYCRR Part 505, <u>and is a non-structural erosion control measure</u>.

(<u>Id.</u> at 2–3) (emphasis added).

The amended complaint asserts that this determination was arbitrary and capricious in violation of the APA because the 14,000 GSCs that the Corps plans to use to construct the Project are structural, and therefore, violate Policy 17 and 17A of the East Hampton LWRP. (Am. Compl. at ¶ 82.)

In response, the Corps asserts that the Plaintiffs' APA claim fails because (i) DOS and East Hampton concurred with the Corps' August 11, 2014 consistency determination, which rendered their claim challenging the determination moot; and (ii) the Plaintiffs were outside the zone of interests protected by the CZMA, and therefore, lacked standing to bring an APA claim. (The Corps' Opp'n Mem. of Law at 16–18.)

In the R&R, Judge Shields agreed with the Corps as to the first argument and did not reach the question of standing. (<u>Id.</u> at 23–24.) In that regard, she cited to several cases dismissing claims under the CZMA where the relevant state and local agencies had concurred with the federal agency's consistency determination. <u>See</u> <u>Knaust v. City of Kingston, N.Y.</u>, No. 96-CV-601 (FJS), 1999 WL 31106, at *7 (N.D.N.Y. Jan. 15, 1999) ("Finally, on May 21, 1996, NYDOS determined that the proposed project would advance New York State's CMP as expressed in the City of Kingston's approved Local Waterfront Revitalization Program. Therefore, the Court finds that Plaintiffs' CZMA claim is moot, and grants the EDA's cross-motion to dismiss the claim."); <u>Enos v. Marsh</u>, 616 F. Supp. 32, 64 (D. Haw. 1984) <u>aff'd</u>, 769 F.2d 1363 (9th Cir. 1985) ("In any event, there can be no violation of the CZMA when the

consistency determination is approved by the state, since the Corps is entitled to rely upon the state's agreement with the determination.").

In addition, Judge Shields found that even if the Court were to rule that the Plaintiffs' APA claim was not moot, the claim was still unlikely to succeed because the August 11, 2014 Consistency Determination did address the policy in the East Hampton LWRP against using structural measures on the Montauk beach by deciding to use GSCs instead of hard structures. (See id. at 25.) Thus, she concluded that "there is more than sufficient evidence to conclude that Corps reasonably decided to go forward with the Project in an effort to accommodate both the local and State plans 'to the maximum extent practicable.'" (Id.)

The Plaintiffs object to the R&R by asserting that: (i) Judge Shields ignored New York regulations which make clear that the GSCs are structural measures, see the Pls.' Objections, 15-cv-2349, Dkt. No. 75, at 8; (ii) an unsworn letter and testimony from a separate 1995 case by Resler, a purported expert in coastal management, establish that their claims are likely to succeed, see id. at 3–4; (iii) Judge Shields misapplied the, "to the maximum extent practicable," standard, see id. at 4–5; and (iv) Judge Shields misapplied the "exigent circumstances" exception to the consistency requirements set forth in the CZMA, id. at 5. As set forth below, the Court finds these objections to be without merit.

As an initial matter, the Court notes that the Second Circuit has suggested, but not decided, that "the only possible private right of action under the Act would be against the federal government through the Administrative Procedure Act." George, 436 F.3d at 104 (quoting parenthetically New York v. DeLyser, 759 F. Supp. 982, 987 (W.D.N.Y. 1991)); George v. Evans, 311 F. App'x 426, 428 (2d Cir. 2009) ("In George I we suggested, without deciding, that the 'only possible private right of action under the [CZMA] would be against the federal

government through the Administrative Procedure Act.'") (quoting 436 F.3d at 104).  Therefore, it remains an open question in this Circuit as to whether private parties, such as the Plaintiffs, can even maintain a suit under the APA for the violation of the consistency provisions set forth in the CZMA.  The fact that the Plaintiffs do not cite to a single case in this Circuit or any other Circuit underscores the weakness of their APA claim.

Based on the Court's own research, other circuit and district courts have recognized APA claims premised on the violation of the consistency provision set forth in the CZMA.  However, those courts have done so on a limited basis, particularly in cases where, as here, the relevant state agency has concurred with the consistency determination of the federal agency.  For example, in Akiak Native Cmty. v. U.S. Postal Serv., 213 F.3d 1140, 1144 (9th Cir. 2000), the plaintiffs, a group of Alaskan Native communities, brought suit against the United States Postal Service ("UPS") challenging the determination by UPS pursuant to the CZMA that its proposed experimental program to deliver non-priority mails by hovercraft in remote areas of Alaska was "consistent to the maximum extent practicable" with the local coastal management plan.  As in this case, the relevant local agency issued a response concurring with UPS's consistency determination.  Id.

The Ninth Circuit upheld the decision by the district court dismissing the plaintiffs' CZMA claim, reasoning that "the Alaska Division of Governmental Coordination and the Postal Service agreed that the Project was consistent with the [local coastal management] Plans, and we will not set aside that agreed conclusion without a 'compelling reason.'"  Id. (quoting Save Lake Wash. v. Frank, 641 F.2d 1330, 1339 (9th Cir. 1981)).  The court found that the plaintiffs' assertion, among others, that "the Postal Service failed to comply with the conditions outlined in Alaska's Consistency Determination" did not provide a "compelling reason" to set aside the

determinations by both federal and state agencies that the project was consistent with the local coastal management plans. Id. Accordingly, the Ninth Circuit affirmed the judgment of the district court denying the plaintiffs' request for a permanent injunction. See id.

By contrast, in Blanco v. Burton, No. CIV.A. 06-3813, 2006 WL 2366046, at *4, 11 (E.D. La. Aug. 14, 2006), the State of Louisiana filed a motion for preliminary injunction challenging the determination by the Mineral Management Service of United States Department of Interior ("MMS") that certain proposed oil lease sales were consistent with the Louisiana Costal Resources Program ("LRCP"). There, the court found that even though MMS had followed the procedural requirements of the CZMA in issuing its consistency determination, its "treatment of the Coastal Use Guidelines set forth in the LCRP is so inadequate as to suggest that proceeding with Lease Sale 200 was a *fait accompli* even before the CD was compiled." Id. at 11–12. Specifically, the consistency determination only incorporated four of the 94 policies of the LRCP and based its assessment on stale information that did "not account for the severe impact and resulting changed circumstances left after Hurricanes Katrina and Rita." Id. at 12. Thus, the court found it "apparent that the cavalier approach adopted to these critical issues rendered a seemingly inadequate result, and one that might fall below the 'arbitrary and capricious' standard, indicating Plaintiffs' substantial likelihood of success on the merits of the CZMA claim." Id. at *13; see also Ocean Mammal Inst. v. Gates, 546 F. Supp. 2d 960, 981 (D. Haw. 2008), modified in part on other grounds, 2008 WL 2020406 (D. Haw. May 9, 2008) (finding that a consistency determination by the Navy was "arbitrary and capricious" in violation of the APA because (i) the Navy failed to adhere to the procedural requirements of the CZMA; and (ii) the Navy relied on a "flawed NEPA analysis" to render its determination).

Here, it is undisputed that the Corps followed the procedural requirements of the CZMA prior to going forward with construction of the Project.  It issued a consistency determination with respect to both the East Hampton LWRP and the CMP on August 11, 2014, and both the DOS and East Hampton concurred with its consistency determination.  As Judge Shields correctly noted, a few district courts that have addressed this issue have suggested that the concurrence by state agencies renders moot any claims under the APA which challenge a federal agency's consistency determination under the CZMA. See Enos, 616 F. Supp. at 64 ("In any event, there can be no violation of the CZMA when the consistency determination is approved by the state, since the Corps is entitled to rely upon the state's agreement with the determination.").

Even if their claim is not moot, the Plaintiffs provide "no compelling reasons" why the Court should overturn the Corps' consistency determination.  For example, the Plaintiffs do not provide evidence that the Corps ignored relevant policies of the East Hampton LWRP or rendered its determination based on stale data that did not account for significant changes to the Montauk community, as was the case in Blanco.

Indeed, quite the opposite appears to be true.  The Corps rendered its consistency determination after undertaking an extensive study of the Montauk area utilizing information from the FIMP Reformulation Study, as well as assessing the Pre-Sandy and Post-Sandy conditions on Montauk beach.  (Cortes Decl., 15-cv-2349, Dkt. No. 58, Ex. 1, at i.)  The Corps also analyzed six different design alternatives based on factors, such as, "general design requirements, costs, and local acceptability."  (Cortes Decl., 15-cv-2349, Dkt. No. 41–6, at 8.) Based on its analysis of these alternative, the Corps determined that a reinforced dune using GSCs was the best plan to address the short-term need for a stabilization measure along Montauk beach while the Corps reviewed the viability of measures intended to protect Downtown

Montauk from future storms on a long-term basis.  It also worked with state and local agencies in developing a plan that was "consistent to the maximum extent practicable" with the East Hampton LWRP and the CMP.

Based on this evidence, there is no question that the Corps' determination that the Project was "consistent to maximum extent practicable" with the East Hampton LWRP was the result of a thorough and reasonable analysis of the relevant factors and different alternatives available. See Karpova v. Snow, 497 F.3d 262, 268 (2d Cir. 2007) ("[S]o long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear, provided the agency's path to its conclusion may reasonably be discerned.").

However, the Plaintiffs assert that the August 11, 2014 consistency determination was "arbitrary and capricious" based primarily on their contention that Corps conclusion that the Project was "non-structural."  (The Pls.' Objections, 15-cv-2349, Dkt. No. 75, at 2.)  To support this assertion, the Plaintiffs first point to a document, dated August 11, 2014, that they allege was prepared by the DOS containing its comments to the August 11, 2014 consistency determination. With respect to Policy 17 of the East Hampton LWRP, this document states, "DOS has always considered geotextile bags a structural measure, which are not consistent with this policy.  Please address."  (Am. Compl., 15-cv-2349, Dkt. No. 5, Ex. 1.)  The Plaintiffs allege that the Corps failed to take this purported objection by the DOS into account when rendering the consistency determination, and therefore, its consistency determination was "arbitrary and capricious."  (The Pls.' Mem. of Law at 11–13.)  The Court disagrees.

The Plaintiffs provide no context or explanation as to who at DOS prepared these August 11, 2014 comments, nor whether DOS ever provided them to the Corps. (See Am Compl., 15-cv-2349, Ex. 1.) Further, it is undisputed that on October 24, 2014, several month later, the DOS sent a letter to the Corps concurring with the Corps' consistency determination. (See id. at Ex. 2.) There is no mention in DOS's October 24, 2014 letter of any objections to the Corps' conclusion that the GSCs are non-structural, nor any other conclusion in the Corps August 11, 2014 consistency determination. Thus, the Plaintiffs' assertion that the Corps ignored concerns expressed by the DOS in its August 11, 2014 comments is contrary to the record in this case, which establishes that the DOS ultimately decided not to object to the Corps' consistency determination.

Next, the Plaintiffs offer an unsworn letter, dated October 22, 2015, by Resler, who purports to be a top expert in the coastal management field, to the Plaintiff's counsel, as well as testimony by Resler in an unrelated case from 1995. (See the Pls.' Objections 3–12.) The Plaintiffs claim that these documents demonstrate a "significant likelihood that the [they] will prevail on the merits." (Id. at 3.) Here again, the Court disagrees for a number of reasons.

First, as the Corps correctly notes, the Plaintiffs did not offer Resler's October 22, 2015 letter, nor his 1995 testimony, before Judge Shields. Courts in this Circuit have often held that "[a]bsent a most compelling reason, the submission of new evidence in conjunction with objections to the Report and Recommendation should not be permitted." VOX Amplification Ltd. v. Meussdorffer, 50 F. Supp. 3d 355, 368 (E.D.N.Y. 2014) (Spatt, J) (quoting E.F. ex rel. N.R. v. New York City Dep't of Educ., 11 CIV. 5243 GBD FM, 2014 WL 1092847, at *5 (S.D.N.Y. Mar. 17, 2014)); see also Hous. Works, Inc. v. Turner, 362 F. Supp. 2d 434, 438 (S.D.N.Y. 2005) ("Nevertheless, litigants cannot be permitted to use litigation before a

magistrate judge as something akin to a spring training exhibition game, holding back evidence for use once the regular season begins before the district judge.").  As the Plaintiffs provide no reason for why they did not submit this evidence before Judge Shields, it is improper to now consider it.

Second, and more importantly, even if it considered the Resler's October 22, 2015 letter and 1995 testimony, the Court finds those documents do not raise a factual issue as to whether the Corps' consistency determination was "arbitrary and capricious."  In that regard, the Court attaches no weight to the Resler's testimony from a 1995 case because the Plaintiffs fail to explain what that case was about, nor why the Court should consider testimony relating to a twenty-year old case involving a different project as relevant to the instant case.  (See Rule 26 Discolosure, 15-cv-2349, Dkt. No. 76–2.)

With respect to the October 22, 2015 letter, Resler offers his opinion that GSCs are structural within the meaning of New York state regulation, and therefore, the Project is "not consistent to the maximum extent possible" with the East Hampton LWRP.  (Id. at Dkt. No. 76-1.)  Even assuming that based on his experience working at DEC, Resler is qualified to render an expert opinion on this issue, his opinion merely reflects a disagreement with the decision rendered by officials at the Corps, the DEC, and East Hampton.  That is simply not enough to show that an agency decision is arbitrary and capricious, particularly where, as here, that decision is based on the agreement of the relevant federal, state, and local agencies.  See Marsh v. Oregon Nat. Res. Council, 490 U.S. 360, 378, 109 S. Ct. 1851, 1861, 104 L. Ed. 2d 377 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.").

The Plaintiffs also assert that the Corps' consistency determination was arbitrary and capricious because they contend that the Corps ignored New York state regulations and the East Hampton LWRP that define GSCs as "structural" measures. (The Pls.' Objections 7–8.) Here again, the Court disagrees.

The East Hampton LWRP does not explicitly define the difference between structural and non-structural measures. It merely states that "non-structural measures . . . shall <u>include</u> (I) the setback of buildings and structures; (II) the planting of vegetation and the installation of sand fencing and draining; (III) the reshaping of bluffs; and (IV) the flood-proofing of buildings of their elevation above the base flood level." (Cortes Decl., 15-cv-2349, Dkt. No. 25–3, at 3) (emphasis added). The use of the word, "include," suggests that this list is intended to be non-exclusive. Therefore, the fact that GSCs is not included in the list of "non-structural" measures set forth in the East Hampton LWRP, does not mean that they are structural measures, as the Plaintiffs contend.

In asserting that New York regulations define GSCs as structural, the Plaintiffs rely on regulations promulgated by the DEC for the approval of permits in coastal erosion hazard areas. 6 CRR-NY 505.1(a). The Plaintiffs' APA claim against the Corps does not raise any issue with the approval by the DEC of coastal management permits. Rather, the claim arises from their contention that the Corps misinterpreted the word "structure" as it is used in the East Hampton LWRP, which does not incorporate or refer to the DEC regulations. Therefore, the DEC regulations do not appear to be applicable in interpreting the word, "structure," as it is used in the East Hampton LWRP.

Even if the DEC regulations were applicable to interpreting the term, "structure," in the East Hampton LWRP, the regulations do not explicitly define GSCs as structures. In particular,

under the DEC regulations, "erosion protection structure" is defined as "a structure specifically designed to reduce or prevent erosion, such as a groin, jetty, seawall, revetment, bulkhead, breakwater, or artificial beach nourishment project."  6 CRR-NY 505.2(p).  In addition, "structure" is defined as:

> any object constructed, installed or placed in, on or under land or water, including but not limited to a building; permanent shed; deck; in-ground and aboveground pool; garage; mobile home; road; public service distribution, transmission, or collection system; tank; pier; dock; wharf; groin; jetty; seawall; revetment; bulkhead; or breakwater; or any addition to or alteration of the same.

Id. (oo).

The Plaintiffs contend that the Project is a "revetment" and therefore, falls under the above-definition of structure.  (The Pls.' Objections, 15-cv-2349, Dkt. No. 75, at 7–11.)  However, "revetment" is not defined by these regulations, and the Plaintiffs provide no reason other than their unsupported assertions for why the Court should consider the Project to be a "revetment."  Thus, the Court finds that the Plaintiffs' contention that the Corps' conclusion that GSCs are non-structural is contrary to New York regulations is without merit.

The Plaintiffs also assert that Judge Shields applied the wrong standard when construing whether the Project violated the CZMA.  (The Pls.' Objections, Dkt. No. 72, at 24.)  They contend that Judge Shields statement, "the standard requires only conformance 'to the maximum extent practicable,'" was incorrect as a matter of law. (The Pls.' Objections, 15-cv-2349, Dkt. No. 75, at 5.)  Again, the Court finds the Plaintiffs' objection is without merit.

As noted, the CZMA requires that "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone shall be carried out in a manner which is consistent to the maximum extent practicable with the enforceable policies of approved State management programs."  16 U.S.C.A. § 1456(c)(1)(A)

(emphasis added).  That is the standard established by the CZMA, and Judge Shields quoted directly from it when considering the Plaintiffs' claim.  (See R&R at 24.)  Thus, Judge Shields plainly applied the correct standard.

Finally, the Plaintiffs contend that Judge Shields erred by holding that the "exigent circumstances" exception applied to exempt the Corps from complying with the CZMA.  (The Pls.' Objections, 15-cv-2349, Dkt. No. 75, at 6.)  CEQ regulations provide that a federal agency "may deviate from full consistency with an approved management program when such deviation is justified because of an emergency or other similar unforeseen circumstance ('exigent circumstance'), which presents the Federal agency with a substantial obstacle that prevents complete adherence to the approved program."  15 C.F.R. § 930.32(b).  Therefore, under this regulation, "exigent circumstances" only become relevant if the agency explicitly determines that its project is not "fully consistent" with an approved state or local management program.

In this case, the Corps determined that the Project was fully consistent with the East Hampton LWRP and CMP, and therefore, did not invoke the "exigent circumstances" exception.  As Judge Shields determined that the Corps' consistency determination was supported by substantial evidence, she did not reach or apply the "exigent circumstances" exception, as the Plaintiffs contend.  Therefore, the Plaintiffs' objection that Judge Shields misapplied the "exigent circumstances" exception is also without merit.

In sum, after a *de novo* review of the record, the Court finds that the Plaintiffs' APA claim that the Corps' August 11, 2014 consistency determination was "arbitrary and capricious" is not likely to succeed.

### c. The EA and FONSI Statement

As discussed earlier, NEPA requires federal agencies to prepare an EIS for any major federal action "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The EIS must address: (i) the environmental impact of the proposed action, (ii) any adverse environmental effect which cannot be avoided should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local and short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. Id.

If an agency is uncertain as to whether a proposed action rises to the level of "a major federal action" requiring an EIS, the agency can prepare a shorter document called an EA, which is released to the public and provides "evidence and analysis" explaining why the agency concluded that an EIS was not necessary. See 40 C.F.R. § 1508.9. If an agency determines that an EIS is not required, it must also issue a FONSI statement, which "briefly present[s] the reasons why an action . . . will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared." See id. at §§ 1501.4(e), 1508.13.

On August 26, 2014, the Corps released drafts of the EA and the FONSI statement on its website and made them available for public comment for a thirty day period. The Corps received a number of comments from agencies and citizens, and incorporated some of those comments into the final EA and FONSI statement.

In the amended complaint, the Plaintiffs assert that the "Corps' FONSI determination violates the requirements of NEPA and is therefore irrational, arbitrary, and capricious."  (Am. Compl. at ¶ 97.)  In particular, the Plaintiffs assert that the Corps failed to take account of:

> 1) stormwater management issues created by the placement of this revetment at, over, and across significant natural drainage and runoff areas; 2) public access issues; 3) effects on the reduction of habitat; and 4) effects of the disruption of the natural longshore sediment transport system that so critically provides natural protection of upland from erosion and flooding.

(Id. at ¶ 100.)

Judge Shields found that the Plaintiffs' APA claim arising from the Corps' NEPA determinations was not likely to succeed because (i) the Plaintiffs failed to object to the draft EA and FONSI statement when they were available for public comment, and therefore, waived their claim; and (ii) even absent waiver, the EA and FONSI statement considered a number of alternatives based on a number of factors, and therefore, was not "arbitrary and capricious" under the APA.  (The R&R at 27–29.)

 The Court agrees with Judge Shields as to the second issue, and therefore, need not reach the issue of waiver.  NEPA imposes only procedural requirements to "ensur[e] that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts."  Winter, 555 U.S. at 23, 129 S. Ct. at 376 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989)).  Stated another way, "NEPA itself does not mandate particular results, but simply prescribes the necessary process."  Robertson, 490 U.S. at 350, 109 S. Ct. at 1846.

Because the statute is procedural in nature, once an agency follows the process provided for by NEPA, a court's review of the agency's decision is limited:  "'[t]he only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot

'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" Stewart Park & Reserve Coal., Inc. (SPARC) v. Slater, 352 F.3d 545, 557 (2d Cir. 2003) (quoting Sierra Club v. U.S. Army Corps of Eng'rs, 701 F.2d 1011, 1029 (2d Cir. 1983)).

Here, there is no question that the Corps took a hard look at the environmental consequences of the Project. It prepared a sixty-one page draft EA that directly addressed nearly all of the issues raised by the Plaintiffs in the amended complaint. With respect to the Plaintiffs' concerns about public access to the beach, the draft EA concluded that any impact on recreation would be temporary and limited because the Project area includes only a "small portion of Kirk Park Beach" and "the construction activities would not occur during the summer tourist season." (Cortes Decl., 15-cv-2349, Dkt. No. 41, Ex. 5, at 38.)

Further, the Court noted that the Project would also greatly benefit public access to the beaches because it "would prevent the loss of beaches in the project area." (Id.) With respect to the Plaintiffs' concern that Project would disrupt the natural habitat and ecosystems on Montauk beach, the EA included a detailed assessment of how the Project would impact the "Nearshore Habitat," the "Intertidal Habitat," "Marine Beach and Dunes and Swales of the Atlantic Shore Ecosystem," the "Freshwater Point," and certain listed species. (Id. at 41–43.) Based on its study and analysis, the EA concluded that there would be no significant impact to these habitats or species as a result of the Project because, among other things, the Project covered a relatively small 3,100 foot area of the beach and construction was expected to last for only a short period. (See id.)

Further, the FONSI statement also addressed the environmental impacts discussed above and concluded that they would be "minor in scope and temporary in duration." (Cortes Decl., 15-cv-2349, Dkt. No. 41, at Ex. 6.)

The Corps reached the conclusions described in the EA and FONSI statement after

conducting an extensive study, informing agencies and stakeholders of the proposed work and

the environmental evaluation contained in the draft EA, and, importantly, providing an

opportunity for them to publicly comment on drafts for a period of thirty days.  In addition, the

Corps did alter the EA and FONSI statements in response to comments from some stakeholders,

such as the EPA.

Based on this record, the Court finds that the Corps clearly took a "hard look" at the

environmental consequences of the Project and that its conclusions were not arbitrary and

capricious.  See, e.g., Coal. for Responsible Growth & Res. Conservation v. U.S. F.E.R.C., 485

F. App'x 472, 474 (2d Cir. 2012) (Summary Order) ("We conclude, based on our review of the

administrative record, that FERC took a 'hard look' at the possible effects of the Project and that

its decision that an EIS was not required was not arbitrary or capricious. Its 296–page EA

thoroughly considered the issues. The Certificate Order carefully reviewed the concerns raised

by the comments. The Rehearing Order addressed petitioners' concerns and further explained

FERC's basis for issuing the FONSI."); Nat'l Audubon Soc., Inc. v. U.S. Fish & Wildlife Serv.,

55 F. Supp. 3d 316, 364 (E.D.N.Y. 2014) (determining that the Corps' FONSI statement was not

arbitrary and capricious because "[t]he Army Corps completed a thorough EA of the Project,

considered all of the environmental effects mentioned in the intensity factors, and reasonably

described the environmental impacts it finds to be 'not significant' and NEPA 'requires no

more.'") (quoting Klein v. U.S. Dep't of Energy, 753 F.3d 576, 584 (6th Cir. 2014)).

In their objections, the Plaintiffs argue that the EA and FONSI statements are inadequate

because they did not address the effect of the Project on "stormwater" management.  (The Pls.'

Objections, Dkt. No. 75, at 17.)  However, the Plaintiffs provide no evidence suggesting that the

Project would have a negative effect on "stormwater" management other than their unsupported conclusory assertions. Nor do they explain why "stormwater" management is relevant to the environmental impact of the Project. Therefore, the Court finds the Plaintiffs' objection to be without merit.

Accordingly, the Court finds that the Corps decision to issue a FONSI statement and EA concluding that the Project would not have a significant impact on the environment was well-supported and not arbitrary and capricious. Thus, the Court, after a *de novo* review, adopts the determination by Judge Shields that the Plaintiffs are not likely to succeed on their APA claim arising from the EA and FONSI statement prepared by the Corps.

In sum, the Court adopts the findings of Judge Shields and holds that the Plaintiffs have failed to satisfy any of the elements required for the issuance of a preliminary injunction halting construction on the Project.

### III. CONCLUSION

For the foregoing reasons, the Court adopts the R&R in its entirety, and as a result, the Court hereby orders that:

(i) the Plaintiffs' request for an evidentiary hearing is denied; and that

(ii) the Plaintiffs' motion for a preliminary injunction is denied; and that

(iii) the Clerk of the Court is directed to close the Removal Action and terminate without prejudice the Defendants' motions to dismiss pending in the Removal Action; and that

(iv) the Intervenors may move to intervene in the Federal Action; and that

(v) the Defendants in the Federal Action have thirty days from the date of this Order, or thirty days after service of the amended complaint, to answer or otherwise move in the Federal Action.

**SO ORDERED.**
Dated: Central Islip, New York
November 30, 2015

_/s/ Arthur D. Spatt____
ARTHUR D. SPATT
United States District Judge